The PEOPLE OF the STATE OF CALI-
FORNIA and the Public Utilities Com-
mission of the State of California, Peti-
tioners,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and the United States of
America, Respondents,

MCI Telecommunications Corp. et al.,
Southern Pacific Communications Co.,
Pacific Telephone and Telegraph Co.,
Computer and Business Equipment
Manufacturers Association, Aeronauti-
cal Radio, Inc., Data Transmission Com-
pany, Remote Processing Services Sec-
tion, Intervenors.

NATIONAL ASSOCIATION OF REGU-
LATORY UTILITY COMMISSION-
ERS, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

MCI Telecommunications Corp. et al.,
Southern Pacific Communications Co.,
The Pacific Telephone & Telegraph Co.,
Computer and Business Equipment
Manufacturers Ass'n, Aeronautical Ra-
dio, Inc., Remote Processing Services
Section, Intervenors.

PACIFIC TELEPHONE AND TELE-
GRAPH COMPANY, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

Remote Processing Services Section,
Southern Pacific Communications Com-
pany, Aeronautical Radio, Inc., MCI
Telecommunications Corporation, Inter-
venors.

Nos. 75–2060, 75–2104 and 75–2157.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 19, 1976.

Decided June 20, 1977.

Certiorari Denied Jan. 9, 1978.

See 98 S.Ct. 721, 722.

Rufus G. Thayer, Jr., San Francisco, Cal., with whom Richard D. Gravelle and J. Calvin Simpson, San Francisco, Cal., were on the brief for petitioners in No. 75–2060.

Stephen G. Kraskin, Deputy Asst. Gen. Counsel, Nat. Ass'n of Regulatory Utility Commissioners, Washington, D. C., for petitioner in No. 75–2104.

Donald K. King, Little Rock, Ark., for petitioner in No. 75–2157. James A. De-Bois, Robert V. R. Dalenberg, San Francisco, Cal., and William B. Rowland, Washington, D. C., were on the brief for petitioner in No. 75–2557.

C. Grey Pash, Jr., Counsel, F. C. C., Washington, D. C., with whom Ashton R. Hardy and Daniel M. Armstrong, Associate Gen. Counsels, F. C. C., and Robert B. Nicholson, Atty., Dept. of Justice, Washington, D. C., were on the brief for respondents. John E. Ingle, Counsel, F. C. C., Washington, D. C., also entered an appearance for respondent, F. C. C.

Herbert E. Forrest, Washington, D. C., with whom Thormund A. Miller, San Francisco, Cal., was on the brief for intervenor, Southern Pacific Communications Co. James M. Tobin, San Francisco, Cal., also entered an appearance for intervenor, Southern Pacific Communications Co.

Michael H. Bader, Kenneth A. Cox and William J. Byrnes, Washington, D. C., were on the brief for intervenors, MCI Telecommunications Corp. and Microwave Communications, Inc.

Herbert E. Marks and James E. Magee, Washington, D. C., were on the brief for intervenor, Remote Processing Services Section of the Ass'n of Data Processing Serv. Organizations, Inc.

Charles R. Cutler, John L. Bartlett and John B. Wyss, Washington, D. C., were on the brief for intervenor, Aeronautical Radio, Inc.

Edward P. Taptich and Virginia S. Carson, Washington, D. C., entered appearances for intervenor, Computer and Business Equipment Manufacturers Ass'n in Nos. 75–2060 and 75–2104.

Kevin H. Cassidy and John M. Scorce, Vienna, Va., entered appearances for intervenor, Data Transmission Co. in No. 75–2060.

Before BAZELON, Chief Judge, and TAMM and ROBINSON, Circuit Judges.

Opinion Per Curiam.

Dissenting Opinion filed by SPOTTS-WOOD W. ROBINSON, III, Circuit Judge.

## PER CURIAM:

The only substantial issue raised on appeal is whether the Commission possesses statutory authority to regulate the facilities in question. As the Commission recognized, the Communications Act grants the Commission broad powers over interstate communications, 47 U.S.C. § 151, but specifically reserves for the states authority to regulate intrastate communications, 47 U.S.C. §§ 152(b), 221(b). The jurisdictional conflict in this case arose because the Foreign Exchange (FX) and Common Control Switching Arrangement (CCSA) facilities in question can be used for both inter- and intra-state communications.

▮ Even though these facilities are located entirely within single states, we conclude that the Commission did not exceed its authority. At the outset, the Commission properly recognized that it may regulate facilities used in both inter- and intrastate communications to the extent it proves "technically and practically difficult" to separate the two types of communications. 56 F.C.C.2d 14, 19, 20 (1975), citing *U. S. Dept. of Defense v. General Telephone Co.*, 38 F.C.C.2d 803, aff'd sub nom. *St. Joseph Telephone & Telegraph Co. v. F. C. C.*, 164 U.S.App.D.C. 369, 505 F.2d 476 (1974); *AT&T–TWX*, 38 F.C.C. 1127, 1133 (1965); and *Telerent Leasing Corp.*, 45 F.C.C.2d 204 (1974), aff'd sub nom. *North Carolina Utilities v. F. C. C.*, 537 F.2d 787 (4 Cir.

1976). We agree with the Commission that the opposite conclusion would leave a substantial portion of the interstate communication service unregulated . . ." 56 F.C.C.2d at 20, and that inconsistent state regulations could frustrate the congressional goal of developing a "unified national communications service." 56 F.C.C.2d at 20.

▮ The Commission next observed that "the physical location of the facilities is not determinative of whether they are interstate or intra-state for regulatory purposes." *Id.* The Commission supported this proposition with substantial case authority. *See* cases cited at *id.* Thus it was logical for the Commission to conclude that "[t]he key issue . . . is the nature of the communications which pass through the facilities, not the physical location of the lines." *Id.* at 21. *United States v. Southwestern Cable Co.*, 392 U.S. 157, 168–9, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). Nothing presented to us casts doubt on the Commission's conclusion that the "facilities are an integral part of a dedicated interstate communications network." *Id.* Consequently, Commission jurisdiction was present.

In addition, we note that the Commission refused to assert jurisdiction over those purely local services that could be practicably separated from inter-state services supplied through the same facilities. The Commission refused to assert authority over local exchange service, leaving any regulation over such service to the appropriate state bodies. It was suggested that the Commission also attempted to separate inter-state FX service from intra-state FX service and assert jurisdiction only over the former. The Commission reasonably concluded that this suggestion was impractical. As the Commission noted, "requiring the customer to maintain two redundant facilities or to invest in expensive additional equipment" would frustrate the Commission's responsibility "to make available, so far as possible to all the people of the United States, a rapid, efficient, Nation-wide and world-wide wire and radio communications service with adequate facilities at reasonable charges." *Id.* at 19, quoting 47 U.S.C. § 151.

Quite recently, the Fourth Circuit had occasion to evaluate many of the arguments raised here. In finding that the Commission's assertion of jurisdiction was proper in that case, the court succinctly articulated the principles that govern this case as well:

We have no doubt that the provisions of section 2(b) deprive the Commission of regulatory power over local services, facilities and disputes that in their nature and effect are separable from and do not substantially affect the conduct or development of interstate communications. But beyond that, we are not persuaded that section 2(b) sanctions any state regulation, formally restrictive only of intrastate communication, that in effect encroaches substantially upon the Commission's authority under sections 201 through 205. In this view of the interrelation of the provisions of the Act, the Commission's declaratory statement of its authority over the interconnection of terminal equipment with the national telephone network is a proper and reasonable assertion of jurisdiction conferred by the act.

*North Carolina Util. Comm'n v. F. C. C.,* 537 F.2d 787, 793–4 (1976), cert. denied, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976).

Consequently, the order of the Federal Communications Commission is

*Affirmed.*

SPOTTSWOOD W. ROBINSON, III, Circuit Judge, dissenting:

Were this case an instance of demonstrated inability to regulate interstate communication without also regulating some aspect of intrastate communication, I would join my colleagues in affirming the Commission. By my reading, however, the record here does not confront us with that sort of situation. Not only does the Commission's critical finding fall short of a standard of unavoidability, but the evidence before the Commission would not have supported a finding purporting to meet it. I must, accordingly, dissent.

I

In 1972, the Federal Communications Commission licensed intervenor Southern Pacific Communications Company (SP) as a common carrier of interstate microwave communications. By virtue of Commission action in other cases,[1] SP is entitled to interconnect with Bell System affiliates to provide interstate foreign exchange (FX) and common control switching arrangement (CCSA) service to its customers.[2] Not content with its interstate business,[3] however, SP subsequently applied to the Public Utilities Commission of California (California) for permission to operate intrastate as well.

The application posed novel problems for California, because SP's proposal portended intrastate competition with specialized communication services offered by petitioner Pacific Telephone & Telegraph Company (PT&T), the state's Bell System affiliate. Under state-approved tariffs, the revenues PT&T derived from those services subsidized certain others, such as local exchange service.[4] California was uncertain as to how SP's competition might affect PT&T's

1. *E. g., Bell Sys. Tariff Offerings,* 46 F.C.C.2d 413, *aff'd sub nom. Bell Tel. Co. v. FCC,* 503 F.2d 1250 (3d Cir. 1974), *cert. denied,* 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975).

2. FX service allows a person "located in one [service area] to, in effect, maintain a local phone in another [service area]." *Bell Tel. Co. v. FCC, supra* note 1, 503 F.2d at 1254 n. 4, citing *Bell Sys. Tariff Offerings, supra* note 1, 46 F.C.C.2d at 418 n. 5 (1974). Thus an FX subscriber in Washington may call and be called by anyone in New York. CCSA "is a private line system for linking the various of-fices of a large company through large switches on a local telephone company's premises." *Id.*

3. One SP official testified before the Public Utilities Commission of California that some customers were unwilling to deal with SP unless it offered both interstate and intrastate services. *Pacific Tel. & Tel. Co. v. Southern Pac. Communications Co.,* No. 84167 (Cal.Pub. Utils. Comm'n, Mar. 4, 1975) (unreported), Joint Appendix (J.App.) 215.

4. J.App. 232.

revenues, so it could not tell what competitive responses on PT&T's part would best suit the public interest.[5]

California therefore initiated a controlled experiment, so to speak, on intrastate competition in telecommunications. In its interim opinion, it authorized SP to conduct—in addition to its interstate operations, over which California claimed no authority—limited intrastate point-to-point service.[6] But it subjected its intrastate grant to various conditions, including the following:[7]

7. Any direct connection of private line circuits to the exchange network is prohibited. This includes any connection similar to foreign exchange service.

Not two months after California issued its interim opinion, SP asked PT&T to interconnect SP's Los Angeles-San Diego private line circuit with the PT&T San Diego exchange network.[8] PT&T acceded to the request, but for reasons of its own sought California's instruction on how it should be treated "in view of the apparent prohibition of Ordering Paragraph 7. . . ."[9] This gambit prompted SP to petition the Federal Communications Commission for a ruling declaring that the Commission, and not California, possessed jurisdiction over all controversies relating to interconnection between the Bell System and competing telecommunications carriers,[10] in order that SP might operate in disregard of Paragraph 7's service limitation.

The Commission dealt with the jurisdictional question as an all-or-nothing proposition. SP's Los Angeles-San Diego link was in its view either an interstate facility subject to exclusive federal jurisdiction or an intrastate facility wholly beyond it.[11] Thus framed, the inquiry was easily answered in favor of federal jurisdiction. The link was "part of a dedicated interstate communications network,"[12] and 82 percent of the calls it was to carry would originate outside California.[13] So it was that the Commission held that California could not impose restrictions on interconnections between the SP line and the San Diego exchange.[14]

## II

It cannot be gainsaid that the Commission has broad powers to regulate the terms and conditions upon which interstate communications will flow along SP's lines, and California neither has nor claims a prerogative to stem that flow. The dispute centers, rather, on the Commission's ouster of state jurisdiction over the 18 percent of messages carried over SP's San Diego link that are wholly intrastate. Although the Commission declined SP's invitation to exert jurisdiction over the local exchange service,[15] it has foreclosed California from banning intrastate FX service that does not comport with California's perception of the public interest.

The linchpin of California's[16] assignment of error is Section 2(b) of the Communications Act of 1934,[17] which in pertinent part specifies that

. . . nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to . . . charges, classifications, practices, services, facilities, or regulations for or in

---

5. J.App. 236.

6. J.App. 237. I am not advised of further administrative or judicial treatment of this matter.

7. J.App. 237.

8. J.App. 54–55.

9. J.App. 41.

10. J.App. 1.

11. *American Tel. & Tel. Co.*, 56 F.C.C.2d 14, 16 (1975).

12. *Id.* at 21.

13. *Id.* at 16.

14. *Id.* at 21.

15. *Id.*

16. California is joined in this contention by PT&T and the National Association of Regulatory Utility Commissioners.

17. Act of June 19, 1934, ch. 652, tit. I, § 2(b), 48 Stat. 1065, as amended, 47 U.S.C. § 152(b) (1970).

connection with intrastate communication service *by wire or radio of any carrier*

. . . .

It is clear that the congressional purpose prompting adoption of this section was to "reserve[] to the states exclusive jurisdiction over intrastate telephone and telegraph communications" [18] to make certain that "the new federal commission, with its 'expansive powers,' would not intrude on the existing regulatory authority of the state commissions over primarily intrastate telephone companies and services." [19] Since the impact of the Commission's order under review is to work just such an intrusion, at the very least it stands in need of some compelling justification.

The Commission acknowledges on the one hand that Section 2(b) "denied [it] jurisdiction over intrastate communications," [20] but disputes on the other that that section "sanctions any state regulation, formally restrictive only of intrastate communication, that in effect encroaches substantially upon the Commission's authority" [21] to ensure that interstate communications are conducted consonantly with the public in-

terest.[22] It relies on a spate of cases upholding Commission ouster of state regulation over interconnection equipment that processes both intrastate and interstate messages.[23] In these cases, however, the facilities were found to be "used in common and indivisibly" [24] for intrastate and interstate service, or "a single unified regulation pattern" was found to be "essential" in a system with vital national functions and no substantial and important local capabilities.[25] In the context of the sensitive congressional balancing in Section 2(b) of federal and state concerns, then, these cases counsel departure from the legislative model of concurrent jurisdiction over facilities devoted to both kinds of traffic only when conflict between exercises of federal and state power is for all practical purposes "unavoidable." [26]

### III

The validity of the Commission's arrogation of power to regulate intrastate FX service thus depends upon whether it is

18. S.Rep.No.781, 73d Cong., 2d Sess. 3 (1934). See H.R.Rep.No.1850, 73d Cong., 2d Sess. 4 (1934) ("[t]he bill . . . exempts the intrastate business of any carrier"); 38 Cong.Rec. 10313 (1934) (remarks of Rep. Rayburn). *Cf.* 78 Cong.Rec. 8823 (1934) (remarks of Sen. Dill) (discussing both § 2(b) and § 221(b), which provides for state retention of jurisdiction over local exchanges that cross state lines). See also 78 Cong.Rec. 8846–8847 (1934).

19. *National Ass'n of Regulatory Util. Comm'rs v. FCC,* 174 U.S.App.D.C. 374, 407, 533 F.2d 601, 634 (1976) (Wright, J., dissenting). See also *id.* at 380, 533 F.2d at 607 (per Wilkey, J.).

20. *American Tel. & Tel. Co., supra* note 11, 56 F.C.C.2d at 20.

21. The language is that of the Fourth Circuit in *North Carolina Utils. Comm'n v. FCC,* 537 F.2d 787, 793 (1976), *aff'g Telerent Leasing Corp.,* 45 F.C.C.2d 304 (1974), upon which the Commission somewhat less elegantly relied. *American Tel. & Tel. Co., supra* note 11, 56 F.C.C.2d at 20–21. See generally Note, *Competition in the Telephone Equipment Industry: Beyond Telerent,* 86 Yale L.J. 538, 540–544 (1977).

22. *Cf.* 47 U.S.C. § 151 (1970).

23. *E. g., North Carolina Utils. Comm'n v. FCC, supra* note 21; *United States Dep't of Defense,* 38 F.C.C.2d 803 (1973), *aff'd sub nom. St. Joseph Tel. & Tel. Co. v. FCC,* 164 U.S.App.D.C. 369, 505 F.2d 476 (1974). Many of the other cases cited in this regard are inapposite, dealing as they do with the Commission's significantly wider powers over broadcasting. See *United States v. Southwestern Cable Co.,* 392 U.S. 157, 169 & n. 29, 88 S.Ct. 1994, 2000–2001 & n. 29, 20 L.Ed.2d 1001, 1011 & n. 29 (1968). *Cf.* S.Rep.No.1090, 83d Cong., 2d Sess. 1 (1954), U.S.Code Cong. & Admin.News 1954, p. 2133 (reporting on Act of Apr. 27, 1954, Pub.L. No.83–345, 68 Stat. 63, which added the words "or radio" to 47 U.S.C. § 152(b) (1970), text *supra* at note 17, in order to ensure that intrastate radio (and microwave) common carriers would not be subjected to the Commission's broadcasting jurisdiction.

24. *North Carolina Utils. Comm'n v. FCC, supra* note 21, 537 F.2d at 791, quoting *Telerent Leasing Corp., supra* note 21, 45 F.C.C.2d at 215.

25. *United States Dep't of Defense, supra* note 23, 38 F.C.C.2d at 813–815.

26. *North Carolina Utils. Comm'n v. FCC, supra* note 21, 537 F.2d at 792.

imperative. And the Commission did state that limited access by SP to the San Diego exchange permitting interstate connection but preventing intrastate connection would be "technically and practically difficult."[27] The Commission did not, however, undertake to explain why such a difficulty would arise,[28] nor how close that difficulty is to impossibility.[29] This unfortunate lack of specificity, is understandable, since the record is devoid of any evidentiary basis for the Commission's assertion,[30] and it is hardly common knowledge.[31] It is to be noted, moreover, that the Commission refused to convene a proceeding in which this factual question could be fleshed out.[32] Since the Commission's finding comes up substantively short and even so is unsupported by the evidence, I cannot accept the conclusions that flow from it.

These basic deficiencies vitiate the Commission's decision whether or not SP is correct in its contention—upon which I intimate no view—that the Commission's jurisdiction over intrastate communications is commensurate with that which the Interstate Commerce Commission enjoys over intrastate transportation.[33] While the latter agency is endowed with greater leeway to intervene in intrastate matters than are others created comtemporaneously with the Communications Commission,[34] its "justification for the exercise of this exceptional federal power to interfere" must nevertheless "be made definitely and clearly apparent."[35] To be sustained in any abrogation

27. *American Tel. & Tel. Co., supra* note 11, 56 F.C.C.2d at 19.

28. The Commission does allude to the possibility of "[r]equiring the customer to maintain two redundant facilities or to invest in expensive additional equipment simply because of jurisdictional conflicts." *Id.* The National Association of Regulatory Utility Commissioners commented to the Commission that "[t]he availability of call restrictors is well known, and a set of facilities for interstate circuits need not also be used for intrastate circuits." J.App. 311. *Cf.* J.App. 148 (comments of American Telephone and Telegraph Company). SP denigrates this suggestion on grounds that "it would be most impractical . . . to segregate intrastate and interstate usage of the FX circuits involved" by such means. J.App. 342. So far as the record shows, this "impracticality" derives from the traditional lack of metering devices on private lines, for call restrictors apparently do operate on other sorts of lines to restrict the geographical ambit of service.

29. If the "difficulty" to which the Commission refers is merely a matter of expense, such as that incurred by affixing call restrictions to SP's private lines, see note 28 *supra*, the Commission can forestall any burdening of interstate commerce merely by allocating that expense to the intrastate traffic. See 47 U.S.C. § 221(c) (1970). To be sure, such an allocation may not please SP, but that is not the Commission's job, which is at an end when the threat to interstate communications has been dissolved. That the onus is placed on intrastate communications—and so outside the Commission's bailiwick—leaves the hard choices to California, where they belong.

30. See note 28 *supra*.

31. *Cf.* 2 K. Davis, Administrative Law Treatise § 15.03 (1958).

32. *American Tel. & Tel. Co., supra* note 11, 56 F.C.C.2d at 20.

33. 49 U.S.C. § 13(4) (1970) codifies the powers attributed to the Interstate Commerce Commission in the *Shreveport Case (Houston, E. & W. T. Ry. v. United States),* 234 U.S. 342, 351–352, 34 S.Ct. 833, 836, 58 L.Ed. 1341, 1348 (1914): "[w]herever the interstate and intrastate transactions of carriers are so related that the government of the one involves the control of the other, it is Congress, and not the State, that is entitled to prescribe the final and dominant rule . . . ." In that case the Commission prohibited enforcement of intrastate traffic rates that worked an undue discrimination on interstate commerce. *Cf. North Carolina v. United States,* 325 U.S. 507, 511, 65 S.Ct. 1260, 1263, 89 L.Ed. 1760, 1765 (1945).

34. See, *e. g., FPC v. Conway Corp.,* 426 U.S. 271, 277, 96 S.Ct. 1999, 2003, 48 L.Ed.2d 626, 632 (1976) ("the legislative history of [the Federal Power Act] indicat[es] that the section was expressly limited . . . to foreclose the possibility" that the *Shreveport* doctrine would apply. *Cf.* 78 Cong.Rec. 8823 (1934) (remarks of Sen. Dill adverting to the *Shreveport* decision during debates on the Communications Act).

35. *Chicago, M., St. P. & P. R. R. v. Illinois,* 355 U.S. 300, 306, 78 S.Ct. 304, 308, 2 L.Ed.2d 292, 298 (1958). Accord, *Utah Pub. Serv. Comm'n v. United States,* 356 U.S. 421, 425, 78 S.Ct. 796, 799, 2 L.Ed.2d 886, 891 (1958); *Florida v. United States,* 282 U.S. 194, 211–212, 51 S.Ct. 119, 123–124, 75 L.Ed. 291, 302–303 (1931).

of state regulatory authority, the Interstate Commerce Commission must make "clear findings, supported by evidence, of each element essential to the exercise of that power . . . ,"[36] and those findings "must meet a 'high standard of certainty.'"[37] No such standard has been satisfied in the case *sub judice.* The Commission thus far has proffered only an ambiguous finding unaccompanied by any evidentiary data whatsoever. This showing is a far cry from what is required, and since unfortunately it has placated my brethren, I must part company with them.

---

**36.** *North Carolina v. United States, supra* note 33, 325 U.S. at 511, 65 S.Ct. at 1263, 89 L.Ed. at 1765. See *Utah Pub. Serv. Comm'n v. United States, supra* note 35, 356 U.S. at 425, 78 S.Ct. at 799, 2 L.Ed.2d at 891.

**37.** *North Carolina v. United States, supra* note 36, 325 U.S. at 511, 65 S.Ct. at 1263, 89 L.Ed. at 1765, quoting *Illinois Cent. R. R. v. Public Utils. Comm'n,* 245 U.S. 493, 510, 38 S.Ct. 170, 176, 62 L.Ed. 425, 438 (1918). Accord, *Utah Pub. Serv. Comm'n v. United States, supra* note 36, 356 U.S. at 425, 78 S.Ct. at 799, 2 L.Ed.2d at 891.