BOROUGH OF LANSDALE

v.

PHILADELPHIA ELECTRIC COMPANY.

Civ. A. No. 78–2533.

United States District Court, E. D. Pennsylvania.

June 4, 1981.

Stephen W. Miller, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for plaintiff.

Raymond T. Cullen, Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant.

## MEMORANDUM

HUYETT, District Judge.

This complex antitrust litigation was initiated by the Borough of Lansdale (Lansdale) against the Philadelphia Electric Company (PE) for alleged violations by PE of section 2 of the Sherman Act. Lansdale is a municipality which owns and operates a municipal electric system which distributes and sells electricity to retail customers within Lansdale. PE is a regulated electrical utility which serves two general classes of customers: wholesale and retail. The rates charged by PE to wholesale customers are governed by tariffs regulated by the Federal Energy Regulatory Commission (FERC), while rates charged retail customers are governed by tariffs regulated by the Pennsylvania Public Utility Commission (PUC). Lansdale is a wholesale customer of PE.

The plaintiff alleges that (1) by refusing to wheel electric power to Lansdale, PE has violated section 2 of the Sherman Act in monopolizing or attempting to monopolize the sale and distribution of electric power at wholesale and at retail levels, Complaint, count I; (2) by PE's application to FERC for an auxiliary service provision, PE has violated section 2, Complaint, count II; and (3) by filing for rate increases with FERC of the rate charged Lansdale and filing with the PUC for an increase in retail rates, PE has effected a "price squeeze" on Lansdale in violation of section 2, Complaint, count III. PE denies Lansdale's allegations and contends that the conduct alleged in counts II and III of Lansdale's complaint is protected activity which cannot be considered a violation of section 2 of the Sherman Act. Accordingly, PE has filed a motion for partial summary judgment on counts II and III and to preclude the introduction of evidence under count I. PE's principal argument is that its activities before FERC and the PUC were exercises of

its first amendment rights to petition the government and therefore, no antitrust liability can result. In addition, PE seeks summary judgment based on the doctrine of *res judicata*. PE has not sought summary judgment on count I which alleges antitrust violations by PE based upon an alleged refusal to wheel, either standing alone or when considered in connection with other alleged practices. Final Pretrial Order § IV, 1, C. However, PE requests that I prohibit the plaintiff from using evidence of PE's conduct before FERC to prove intent under count I because the introduction of this evidence would be "prejudicial" and would chill the exercise of PE's right to petition.

Lansdale opposes the motion on several grounds. It contends: (1) the defendant's activities are not immune from antitrust liability; (2) even if the defendant's activities would ordinarily be immune, the so-called "sham" exception to that immunity applies; (3) whether or not the sham exception applies is a question of fact for the jury; (4) even if the defendant's activities are immune, that immunity will be overcome if the jury accepts the plaintiff's allegation of abuses of the administrative process and illegal activity violating the antitrust laws external to the administrative process; (5) *res judicata* is not applicable; and (6) even if no liability can be imposed upon the defendant based on its conduct before FERC, evidence of that conduct is still admissible under count I.

On June 2, 1981, following oral hearing and upon consideration of the briefs submitted by both sides, the affidavit of Alvin J. Rowe, Jr., and exhibits attached to the affidavit, I denied the defendant's motion stating that I would give the parties my reasons in writing shortly thereafter. This is the statement of my reasons for denying the motion.

The immunity upon which PE relies is frequently referred to as the "*Noerr-Pennington*" doctrine or immunity. *See United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern Railroad Presidents Confer-*

*ence v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). Broadly stated, the *Noerr* and *Pennington* cases hold that a defendant cannot be held liable under the antitrust laws for activities that are encompassed within the first amendment's guarantee of the right to petition the government for redress of grievances. The *Noerr* Court concluded that "political" activity by railroads attempting to influence the decision of legislators was protected. In *Pennington*, the Court held protected similar activity directed at influencing the decision of an executive official. The cases held that these activities were protected "even though intended to eliminate competition." 381 U.S. at 670, 85 S.Ct. at 1593.

In *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Supreme Court held that the *Noerr-Pennington* immunity extended to actions before courts and administrative agencies. The Court observed "[c]ertainly the right to petition extends to all departments of the Government." 404 U.S. at 510, 92 S.Ct. at 612. Although subsequent Supreme Court cases have referred to the immunity in *dicta*, this trilogy, *Noerr, Pennington* and *California Motor Transport*, contains all the Supreme Court law in this area.

The scope of the branch of the immunity relating to activity before adjudicative bodies (first recognized in *California Motor Transport*) has been the subject of some disagreement. For discussion of the unresolved issues in this area, *see* Balmer, *Sham Litigation and the Antitrust Laws*, 29 Buffalo L.Rev. 39 (1980); Kaler, *The Sham Exception to the Noerr-Pennington Antitrust Immunity: Its Potential For Minimizing Anticompetitive Abuse of the Administrative Regulatory Process*, 12 Tol.L.Rev. 63 (1980). Some generalization is possible. In all the modes of government to which it applies, legislative, executive, and adjudicatory, the immunity is subject to defeat. It is most frequently defeated by the application of the sham exception. The Court recognized from the outset that the immu-

nity was not absolute. In *Noerr*, the Court stated: "[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." 365 U.S. at 144, 81 S.Ct. at 533. When the defendant claims that it is immune from liability based upon activities before an adjudicative body, the immunity can be overcome if the sham exception applies, although the elements of the exception are not entirely certain. *Compare Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board*, 542 F.2d 1076 (9th Cir. 1976), *cert. denied*, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977), *noted in* 30 Vand.L.Rev. 75 (1977) (holding that repeated, baseless opposition before an adjudicative body does not result in loss of *Noerr-Pennington* immunity absent conduct external to or abusive of the adjudicatory process) *with Associated Radio Service Company v. Page Airways, Inc.*, 414 F.Supp. 1088, 1096 (N.D.Tex.1976) (plaintiff need only be able to show that the defendant initiated proceedings for the specific purpose of achieving an unlawful, anticompetitive objective collateral to that appearing on the face of the action, and that the defendant committed specific acts—other than those acts incidental to the normal use of the proceedings—directed at obtaining that objective). In considering whether the immunity has been overcome, it is significant that the Supreme Court and others have suggested that in the adjudicative process, the immunity itself may be more circumscribed. In other words, at least in this area, the sham exception may not be the only exception to the immunity. *See California Motor Transport v. Trucking Unlimited*, 404 U.S. at 513, 92 S.Ct. at 613 ("[t]here are many other forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations"). The apparent conflict in some of the cases applying the sham exception might be resolved by considering whether the courts are applying a single exception or, rather, a fact-specific analysis under the rubric, "sham."

In any event, a number of courts have recognized that the question of whether the immunity applies or has been overcome is one for the fact finder to decide. *Otter Tail Power Co. v. United States*, 410 U.S. 366, 379, 93 S.Ct. 1022, 1030, 35 L.Ed.2d 359 (1972) (remanding to the district court to determine as a matter of fact whether litigation undertaken for the purpose of delay was a sham); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972) ("a pattern . . . may emerge which leads the *factfinder* to conclude that the administrative and judicial processes have been abused"); *City of Mishawaka v. American Electric Power Company, Inc.*, 616 F.2d 976 (7th Cir. 1980) (concluding after a full trial that the immunity did not apply); *Kurek v. Pleasure Driveway & Park District*, 557 F.2d 580 (7th Cir. 1977), *vacated on other grounds*, 435 U.S. 922, 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1978) ("facts provable under the complaint could well establish that . . . proposal was a mere sham").

■ In this case, the plaintiffs have argued that the *Noerr-Pennington* immunity does not protect the defendants from antitrust liability. Based upon the allegations in counts II and III, it appears that the plaintiff in fact relies upon acts by the defendant before an adjudicative body of the type to which *Noerr-Pennington* immunity generally attaches. Based on the current record, it appears to me that the better view is that activities in the course of regulatory proceedings like those involved in this case are protected by the immunity unless and until an exception to the immunity is demonstrated. *See City of Mishawaka v. American Electric Power Company*, 616 F.2d 976 (7th Cir. 1980); *but cf. United States v. Southern Motor Carriers Rate Conference, Inc.*, 467 F.Supp. 471 (N.D.Ga. 1979).

█ If *Noerr-Pennington* applies, the plaintiff argues that it can present evidence from which the jury could conclude that the filings in counts II and III were within the sham exception. The plaintiff has offered by way of affidavit the evidence it intends to offer at trial to show that there was no economic justification for the filings referred to in count II and that the filings in count III considered alone or in connection with the other allegations in the case amounted to sham. Based upon this showing and the cases cited above, I conclude that the issue of whether an exception to the *Noerr-Pennington* immunity applies is a question of fact.

The defendant has also sought summary judgment on the basis of the doctrine of *res judicata*. The defendant contends that the issues raised by counts II and III have already been litigated before the administrative agency and resolved against the plaintiff. For this reason, the defendant argues, I should preclude the plaintiff from proceeding on a Sherman Act theory.

█ Before the doctrine of *res judicata* can apply there must be (1) a final judgment on the merits of a cause of action; (2) in a suit between the same parties; and (3) a second suit involving the same cause of action. 1B Moore's Federal Practice ¶ 405[1]. In the absence of identity of the causes of action in the first and second lawsuits, the doctrine of *res judicata* is inapplicable. *Fiumara v. Sinclair Refining Co.*, 385 F.2d 395 (3d Cir. 1967). It is not sufficient that the causes of action are related; they must be so closely related that matters essential to recovery in the second action have been determined in the first action or the doctrine of *res judicata* does not apply. Identity of causes of action does not exist where the subject matter and the ultimate issues are not the same.

█ In the present suit, the ultimate issue is whether the defendant's actions violate the proscriptions of Sherman Act section 2 relating to monopolization. In the FERC proceedings, the ultimate issue was whether the rates were just and reasonable. FERC acted pursuant to sections 205(b) and 206(a) of the Federal Power Act, 16 U.S.C. § 824 *et seq.* as the Supreme Court has interpreted FERC's duty under that statute. *See Federal Power Commission v. Conway Corp.*, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976). FERC's duty under that statute requires it to consider the anticompetitive impact of proposed rates. However, the Commission itself has acknowledged that it does not undertake an analysis that is entirely coextensive with the Sherman Act:

> The policies underlying the antitrust laws represent this country's fundamental economic view that competition is to be maintained and enhanced wherever feasible. The electric utility industry is an industry in which competition exists and is, therefore, subject to scrutiny both in the courts for possible antitrust violations and in this Commission for actions which may have anticompetitive effects. The Commission, in exercising its authority under the Federal Power Act, is required to "consider matters relating to both the broad purposes of the [Federal Power] Act and the fundamental national policy expressed in the antitrust laws." *Gulf States Utilities Co. v. F.P.C.*, 411 U.S. 747, 759–760, 93 S.Ct. 1870, 1878, 36 L.Ed.2d 635 (1973).

> The implementation of the policies underlying the antitrust laws cannot become the paramount goal of this Commission, however. The Commission does not enforce the antitrust laws. In carrying out its responsibility to set just and reasonable rates for public utilities, the Commission must determine what is in the public interest. Such a determination may involve considerations which outweigh the anticompetitive effect of a particular filing. *Missouri Power & Light Co.*, Docket No. ER 76–539, Opinion No. 31, 10–11 (October 27, 1978).

Accordingly, I conclude that the ultimate issues before FERC were not identical to the ultimate issues here and therefore, *res judicata* is not grounds for partial summary judgment.

Finally, the defendant argues that I should bar the introduction of evidence of its activities before FERC on the issue of intent in count I. In the *Pennington* case, the Supreme Court commented that even where the activity is immunized "[i]t would still of course be within the province of the trial judge to admit this evidence, if he deemed it probative and not unduly prejudicial, under the 'established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transaction under scrutiny." 381 U.S. at 670 n.3, 85 S.Ct. at 1593 n.3 (citations omitted). Since I have concluded that partial summary judgment is not appropriate on counts II and III, the evidence which defendant sought to bar will be admitted under those counts. Therefore, I do not think that this argument has the same importance to defendant as it would have if summary judgment could have been granted on counts II and III. Based upon the discussion of *Noerr-Pennington* above and the quoted language in footnote 3, I conclude that *Noerr-Pennington* would not bar the admission of FERC activities if relevant under count I. *See also Mishawaka v. American Electric Power Company, Inc.*, 616 F.2d 976 (7th Cir. 1980).

For all these reasons, defendant's motion was denied in open court and by order of June 2, 1981.