# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3000

_____

| | | |
|---|---|---|
| Northern States Power Company, | * | |
| a Minnesota Corporation; Northern | * | |
| States Power Company, a Wisconsin | * | |
| Corporation; | * | |
| | * | |
| Petitioners, | * | |
| | * | |
| Minnesota Department of Public | * | |
| Service; Dairyland Power Cooperative, | * | |
| | * | |
| Intervenor on Appeal, | * | |
| | * | Petition for Review of an Order |
| v. | * | of the Federal Energy Regulatory |
| | * | Commission. |
| Federal Energy Regulatory | * | |
| Commission; | * | AMENDED OPINION |
| | * | |
| Respondent, | * | |
| | * | |
| Wisconsin Electric Power Company; | * | |
| Southern Minnesota Municipal Power | * | |
| Agency; Missouri River Energy | * | |
| Services; Enron Power Marketing | * | |
| Incorporated, | * | |
| | * | |
| Intervenor on Appeal, | | |

_____

Submitted:  March 8, 1999

Filed:  May 14, 1999
_____

Before FAGG, LAY, and WOLLMAN, Circuit Judges.
_____

LAY, Circuit Judge.


On April 24, 1996, the Federal Energy Regulatory Commission ("FERC") promulgated Order No. 888[1] requiring "all public utilities that own, control or operate facilities used for transmitting electric energy in interstate commerce to have on file open access non-discriminatory transmission tariffs that contain minimum terms and conditions of non-discriminatory service." Order No. 888, 61 Fed. Reg. 21,540 (1996). FERC's stated goal was to encourage competition in the wholesale bulk power market place "and to bring more efficient, lower cost power to the Nation's electricity consumers."  *Id.*  Order No. 888 became final and effective on July 9, 1996. Thereafter, Northern States Power Company ("NSP") filed proposed revisions of its

_____

[1]*See Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, [Regs. Preambles Jan. 1991-June 1996], FERC Stats. & Regs. ¶ 31,036, *clarified*, 76 FERC ¶ 61,009 and 76 FERC ¶ 61,347 (1996), *modified*, Order No. 888-A [Regs. Preambles], III FERC Stats. & Regs. ¶ 31,048 (1997), *order on rehearing*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *on rehearing*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *petitions for review pending sub nom. Transmission Access Policy Study Group, et al. v. FERC*, Nos. 97-1715, *et al.* (D.C. Cir., Mar. 30, 1998) (hereinafter collectively as "Orders").

Open Access Transmission Tariff ("NSP Tariff")[2] to comply with the requirements of FERC Orders Nos. 888, 888-A, 888-B and 888-C and to file new tariffs that were consistent with the *pro forma* tariff of Order No. 888.

FERC rejected the proposed changes to the NSP Tariff's curtailment provisions on the grounds that: 1) NSP had defined curtailment priorities only through general references to unexplained procedures; 2) NSP had failed to demonstrate that the proposed terms were consistent with, or superior to, the *pro forma* tariff terms required by Order No. 888; and 3) NSP's description of the proposed procedures was misleading. Thereafter NSP filed this petition for review. On August 25, 1998, this court denied NSP's stay request and shortly thereafter denied FERC's motion to transfer the case to the United States Court of Appeals for the District of Columbia, or to hold the case in abeyance pending the omnibus appeal of FERC's Order No. 888 rule-making in the D.C. Circuit.

*JURISDICTION*

Initially, FERC has moved to dismiss these proceedings for lack of jurisdiction. It argues that the petitions for review filed by NSP constitute a collateral attack upon Order 888. In essence, NSP challenges FERC's regulation and possible curtailment of bundled retail electric sales,[3] arguing that such actions are outside of FERC's

---

[2]*Order accepting Open Access Transmission Compliance Tariff, Accepting in Part and Rejecting in Part Proposed Revisions, Instituting Investigation, Establishing Hearing Procedures and Refund Effective Date, and Consolidating Dockets*, 83 FERC ¶ 61,098 (April 30, 1998); *Order on Requests for Clarification*, 83 FERC ¶ 61,338 (June 29, 1998); *Order Denying Requests for Clarification, Rehearing and Stay*, 84 FERC ¶ 61,128 (July 31, 1998) (hereinafter collectively as "Curtailment Orders").

[3]NSP defines "bundled" electric sales to its retail customers as follows: "'Bundled' service means the generation, transmission, and distribution of electricity

jurisdiction. In its Curtailment Orders, both rejecting and accepting NSP's petitions, FERC failed to raise the issue of collateral attack. Nevertheless, FERC now asserts that NSP's proposed revisions were not timely and should have been made at the time Order No. 888 was being promulgated. It urges that the belated challenges by NSP should have been included in the rule-making proceedings pending before the United States Court of Appeals for the District of Columbia. We disagree.

Section 313(b) of the Federal Power Act ("FPA"), 16 U.S.C. § 825*l*(b), provides that "[a]ny [aggrieved] party to a proceeding under [the FPA] . . . may obtain a review of such order in the United States Court of Appeals for any circuit wherein . . . the public utility to which the order relates is located or has its principle place of business." *Id*. The proceedings in this petition for review relate to the proposed tariffs filed by NSP pursuant to Order No. 888. Involved are the differing interpretations of the Orders as they affect the tariffs filed by NSP.

FERC asserts, as it must, that it has no intention of regulating retail sales to NSP customers, while also maintaining that its curtailment provisions apply only to wholesale sales, over which it has explicit jurisdiction. FERC concedes that its jurisdiction relates only to terms and conditions of electric transmission service provided by public utilities engaged in interstate commerce. *See* Respondent's Brief at 34. FERC's order requires that there be no discrimination in curtailment of electrical power when power constraints take place between the wholesale customer, who falls under FERC's jurisdiction, and the native/retail consumers, who are regulated solely by the state. *See Order Denying Requests for Clarification, Rehearing and Stay*, 84 FERC ¶ 61,128 (1998). NSP points out that under FERC's interpretation, the direct affect of FERC's curtailment orders will cause a nonjurisdictional disruption of service

together with all other services (meter reading, billing, equipment repair, supply curtailment) necessary to satisfy the customer's complete electric service needs." Petitioner's Brief at 2.

affecting NSP's native/retail consumers.

We conclude that these adverse arguments defeat FERC's jurisdictional objections and lay bare the distinction between the rule-making proceedings pending before the United States Court of Appeals for the District of Columbia and the present petition for review in this case. We therefore reject FERC's argument to dismiss for lack of jurisdiction.

*THE MERITS*

The fundamental issue to be decided on this appeal is whether FERC may, through its tariff orders, require NSP, a public utility, to curtail electrical transmission to wholesale (point-to-point) customers on a comparable basis with its native/retail consumers when it experiences power constraints. FERC acknowledges that it cannot permissibly affect state regulation of retail rates and practices. FERC argues that it has simply required that, as to transmission curtailment, NSP may not discriminate against a third party in favor of its own native/retail consumers. Thus, it asserts that Order No. 888 makes clear that a transmission provider must curtail electrical transmission on a comparable and nondiscriminatory basis, including the provider's own use of the system. Under the tariff, public utilities will not be allowed to continue curtailment practices that give priority to bundled, native/retail load consumers over point-to-point users involved in interstate commerce. FERC suggests that there is no justiciable issue here. It reasoned:

> The *pro forma* tariff requires comparability of curtailments when consistent with Good Utility Practice. The Commission would not expect NSP Companies to violate Good Utility Practice when implementing curtailments. Further, the *pro forma* tariff allows the Transmission Provider the discretion to curtail firm transmission service when an emergency or other unforeseen condition impairs or degrades the reliability of its transmission system. Absent such system reliability

concerns, however, NSP Companies must engage in a pro-rata curtailment.

*Order on Requests for Clarification*, 83 FERC ¶ 62,338 (1998).

However, the mere fact that the provider may exercise curtailments within its sole discretion is not the problem. The problem arises when NSP exercises its discretion to curtail service, but may then do so only by curtailing both wholesale and native/retail electric sales on an equal basis and not by giving preferential treatment to its native/retail load. Thus, NSP argues, when there exists a power constraint, by providing curtailment to its native/retail consumers on a *pro rata* basis with wholesale users, NSP will be forced to provide interruptible service to its native/retail consumers. According to NSP, a *pro rata* curtailment will detrimentally affect native/retail consumers who have no other alternatives available to obtain electrical service. NSP urges that when wholesale (point-to-point) customers are curtailed in electrical transmission, the wholesale customer has alternative sources from which to obtain continuous electrical supply, through either the purchase of electricity from another provider, or via their own power generation facilities. Illustrative of this argument, NSP points to the circumstances involving Wisconsin Electric Power Company ("WEP"), an intervenor in this proceeding, and itself when WEP experienced curtailment of electrical transmission by NSP in the summer of 1998. WEP had to resort to alternative power, albeit at a higher price due to the emergency curtailment.[4] Unless we totally miscomprehend the arguments involved, we feel that FERC's observation that no inherent conflict exists between its mandates and practical application is viewed through an adversarial bias.

---

[4]Wisconsin Electric Power Company argues in its intervenor brief that NSP should be required to furnish electrical transmission on a comparable basis with its native/retail customers so as to obviate Wisconsin Electric Power Company from having to black out its own retail customers. If such an argument assumes that NSP must black out its retail customers so that Wisconsin Electric Power Company's customers may have continuous service, we deem such argument unrealistic.

-6-

The more fundamental issue involved here, aside from the practicalities of the situation, is whether FERC has the jurisdiction to affect the curtailment practices of NSP when dealing with NSP's native/retail consumers. FERC argues that it does not, in any way, attempt to affect state regulation of retail rates and practices. At the same time, FERC points out that its jurisdiction over interstate sales is not made in a vacuum. As in *Conway Corp. v. FPC*, 510 F.2d 1264 (1975), *aff'd sub nom.*, *FPC v. Conway Corp.*, 426 U.S. 271 (1976), it argues the jurisdiction of the FPC is not "insulated from nonjurisdictional factors." *Id.* at 1272. In *Conway*, an electric utility was engaged in jurisdictional (wholesale) and nonjurisdictional (retail) sales. A portion of the utility's wholesale customers competed against it by reselling electricity purchased from the utility to other retail consumers. The wholesale customers alleged that the wholesale price was inflated in order to prevent them from competing for retail business. The Supreme Court held that the Federal Power Act authorized FERC to examine the entire factual context surrounding the wholesale rates, including facts related to the nonjurisdictional retail transactions. *See Conway*, 426 U.S. at 280.

FERC relies upon the language of the United States Court of Appeals for the District of Columbia in *Conway* that FERC may take into consideration nonjurisdictional concerns "when germane to the meaningful execution of a jurisdictional function." *Conway*, 510 F.2d at 1272. We have no disagreement with these abstractions. However, one of the problems in the *Conway* case is the distinction pointed to by Judge Douglas Ginsburg in *Altamont Gas Transmission Company v. FERC*, 92 F.3d 1239 (1996). In *Altamont*, as the result of perceived discrimination against interstate gas shipments, FERC authorized a utility to begin building a new facility, but lowered the utility's allowed rate of return until the utility could demonstrate that it's rates and policies no longer discriminated against interstate shippers. In taking note of the Supreme Court's delineation in *Conway*, Judge Ginsburg posited that jurisdictional implications of a nonjurisdictional transaction are germane only "[i]f the undue preference or discrimination is . . . traceable to the level of the jurisdictional rate." *Id.* at 1247 (citing *Conway*, 426 U.S. at 277). We have the

same difficulty here, at least by analogy, that the alleged discrimination is traceable to the nonjurisdictional sale of bundled service provided by NSP to the native/retail consumer rather than to the service provided to interstate customers.[5]

As NSP points out, it is given monopolistic control by the five states in which it operates. NSP is a vertically integrated electrical utility and provides electrical service throughout Minnesota, Michigan, North Dakota, South Dakota, and Wisconsin to an estimated two million retail customers. NSP argues that the exclusive grant given by these states to sell to native/retail consumers is on a *quid pro quo* basis; to wit, that NSP's native/retail consumers may depend on bundled sales without curtailment of service. In Order No. 888, FERC recognizes its own jurisdictional limits and states "[w]e reiterate that we are not requiring the transmission provider to unbundle transmission service to its retail/native load nor are we requiring that bundled retail service be taken under the terms of the Final Rule pro forma tariff." *Id.* at 21,604. This apparent concession is statutorily driven. Under 16 U.S.C. § 824(a), Congress has expressly provided that "Federal regulation . . . extend[s] only to those matters which are not subject to regulation by the States." *Id.* Section 824(b)(1) provides:

> The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of

---

[5]We think it can also be questioned whether the bundled electric sales, as defined n.3 *supra*, is in the same class of service provided in the sale of electrical power to point-to-point customers. We find the difference in the products sold in itself justifies preferential treatment to native consumers beyond the reach of Tariff Order No. 888.

this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

*Id.*

NSP argues that to comply with FERC's interpretation of Order No. 888, as requiring comparable and equal service to point-to-point customers, along with its native/retail consumers, would violate state regulatory laws. For example, in the state of Minnesota NSP may not shed its retail load absent an emergency or when electric supply is limited or unavailable. *See Northern States Power Company,* MINNESOTA ELECTRIC RATE BOOK, GENERAL RULES AND REGULATIONS, Section 6, *Curtailment or Interruption of Service*, § 6.2 (Add. 41); MINN. STAT. § 216B.37-.42. The state tariffs in the other states provide similar limitations.[6] Thus, NSP argues that if it is required to provide comparable transmission to both its retail and wholesale customers on a *pro rata* basis, that its native/retail consumers will face power outages contrary to the obligation set out in the state tariffs, in turn causing conflict with the long-held position that once a tariff has been approved, it has the force of law and is binding upon the parties. *See Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 251-52 (1951). NSP urges that state authority over its bundled service is jeopardized if FERC requires, under the guise of nondiscrimination, *pro rata* curtailment of the power supply to NSP's native/retail consumers.

As indicated, when the circumstances require curtailment in the transmission of electricity, most wholesale customers may use alternative supplies from other utilities or generate power themselves, and can avoid power outages through such practice. The native/retail consumer, however, is unable to turn to alternative sources of supply.

---

[6]*See* MICH. COMP. LAWS § 460; N.D. CENT. CODE § 49; S.D. CODIFIED LAWS § 49; WISC. STAT. § 196.

For these reasons, NSP urges that Good Utility Practice requires that wholesale transactions be curtailed before a utility is forced to shed its native/retail load. Thus, we find that NSP, through FERC's interpretation, is placed between the proverbial rock and hard place, and will in effect be in violation of either a state tariff or Order No. 888.

FERC responds simply that it does not operate in a vacuum and that it is not exercising any of its regulatory powers directly, but that through the enforcement of a federal tariff, there could be a lawful, indirect effect upon NSP's services to its native/retail consumers. NSP urges that this allows FERC to do indirectly what it is prohibited from doing directly, intercede in a matter reserved by Congress to the states. *See Altamont*, 92 F.3d at 1248. FERC's ultimate answer to all of this is that where there is a clash between its tariffs and the state law, the federal tariff must prevail under the Supremacy Clause. We cannot agree.

Before reviewing constitutional concerns relating to the Supremacy Clause, it is fundamental that this court must first satisfy itself that FERC has Congressional approval to regulate NSP in the manner now attempted. Congress has drawn a "bright line" between state and federal regulation. Here, there is no conflict between the state and federal regulatory schemes. In fact, FERC concedes that it has no jurisdiction whatsoever over the state's regulation of NSP's bundled retail sales activities. *See* Order No. 888-A, 62 Fed. Reg. 12,274, 12,299 (1997). Additionally, any reliance upon *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986), for the proposition that a state must defer to FERC's decision making for fear of running afoul of the Commerce Clause is also misplaced. In *Nantahala*, the Court applied the "fixed rate doctrine" under which interstate power rates filed with or fixed by FERC had to be given binding effect by state utility commissions in determining intrastate rates. This is not an issue here. In *Nantahala*, the Court was dealing with hydroelectric power and facilities which obtained its power supply from the Tennessee Valley Authority, as well as navigable waters and dams placed thereon. In the present case, we have nothing

comparable to the generation of electrical power that was involved in *Nantahala*. *Cf. FPC v. Louisiana Power & Light Co.*, 406 U.S. 621 (1972). We think it obvious that the indirect effect of Order No. 888, as interpreted by the Commission, is an attempt to regulate curtailment of electrical power to NSP's native/retail consumers. Despite FERC's denial as to nonjurisdictional regulation, we find it has transgressed its Congressional authority which limits its jurisdiction to interstate transactions. As such, its attempt to regulate the curtailment of electrical transmission on native/retail consumers is unlawful, as it falls outside of the FPA's specific grant of authority to FERC.

This cause is remanded to FERC to allow amendment to its curtailment orders, as now interpreted under Order No. 888, so as to not encroach upon the authority of the regulatory commissions of the states.

IT IS SO ORDERED.
A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.